UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

RICKY G. PRYOR,                          )
                                         )
              Plaintiff,                 )
                                         )
       v.                                )        No. 4:11 CV 390 ERW / DDN
                                         )
                                         )
MICHAEL J. ASTRUE,                       )
Commissioner of Social Security,         )
                                         )
              Defendant.                 )

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This action is before the court for judicial review of the final
decision of defendant Commissioner of Social Security denying the
application of plaintiff Ricky G. Pryor for disability insurance benefits
under Title II of the Social Security Act, 42 U.S.C. § 401, <u>et seq.</u>  The
action was referred to the undersigned United States Magistrate Judge for
review and a recommended disposition under 28 U.S.C. § 636(b).  For the
reasons set forth below, the undersigned recommends the ALJ's decision
be reversed and remanded.

**I.  BACKGROUND**

On June 11, 2007, plaintiff applied for disability insurance
benefits, alleging an onset date of December 12, 2006 due to affective
mood disorder and substance dependence disorder (alcohol).  (Tr. 45.)
His claim was denied initially and he requested a hearing before an ALJ.[1]
(Tr. 50-54, 58.)

On May 7, 2009, following a hearing, the ALJ found plaintiff was not
disabled.  (Tr. 8-17.)  On January 10, 2011, the Appeals Council denied
his request for review.  The decision of the ALJ became the final
decision of the Commissioner.  (Tr. 1-3.)

---

[1]Missouri is one of several test states participating in modifications to
the disability determination procedures which apply in this case.  20
C.F.R. §§ 404.906, 404.966 (2007).  These modifications include, among
other things, the elimination of the reconsideration step.  <u>See</u> <u>id.</u>

## II. ADMINISTRATIVE RECORD

On November 29, 2006, plaintiff saw his primary care physician, Julius F. Punzalan, M.D. regarding his bipolar disorder. Dr. Punzalan diagnosed plaintiff with bipolar disorder and anxiety and instructed him to take Xanax and Symbyax.[2] (Tr. 190.)

Plaintiff returned to Dr. Punzalan on December 18, 2006 because he was having trouble with his bipolar disorder and because he was shaking. He reported that he had to leave work six days earlier because of his bipolar disorder. Dr. Punzalan noted plaintiff appeared anxious and tremulous. Dr. Punzalan diagnosed plaintiff with anxiety and major depression, advised him to continue taking Xanax and Symbyax, and recommended he take time off from work. (Tr. 189.)

On January 2, 2007, plaintiff saw Dr. Punzalan for a two-week checkup. Plaintiff reported that he was doing better. Dr. Punzalan prescribed Buspar for anxiety.[3] (Tr. 188.)

On January 16, 2007, plaintiff saw Dr. Punzalan for a checkup, reporting he felt improved and that the Xanax and Buspar prescriptions were helping his symptoms. Dr. Punzalan noted that he believed plaintiff should see a psychiatrist for further evaluation. (Tr. 187.)

On January 29, 2007, plaintiff saw Frederick Hicks, M.D., for an evaluation regarding his bipolar disorder and anxiety. Dr. Hicks noted that plaintiff reported being anxious about returning to work and had a low mood, sleep disturbance with increased sleep, appetite disturbance, fatigue, poor motivation and interest, and self-deprecating thoughts. Plaintiff explained his current work position was stressful because of the complex tasks and high level of independence. Plaintiff was considering looking for a new job. He also reported he has compulsive rituals and that he viewed himself as being very emotionally unstable before taking Symbyax. Plaintiff also told Dr. Hicks that he had been

---

[2]Xanax is used to treat anxiety and panic disorders. Symbyax is used to treat a variety of conditions, including depression and other mental/mood disorders. WebMD, http://www.webmd.com/drugs (last visited November 16, 2011).

[3]Buspar is used to treat anxiety. WebMD, http://www.webmd.com/drugs (last visited November 16, 2011).

involved in binge drinking in the past. Dr. Hicks noted that plaintiff appeared anxious, tense, and downcast, but that plaintiff had no suicidal or homicidal thoughts, hallucinations, or delusions. Dr. Hicks diagnosed plaintiff with bipolar disorder depressed, likely obsessive-compulsive disorder with poor insight, and alcohol dependence sustained full remission, and assessed a GAF score of 45/65.[4] Dr. Hicks instructed plaintiff to discontinue taking Symbyax, to continue taking Buspar, and to start taking Depakote and Abilify.[5] Dr. Hicks also recommended plaintiff not work until at least March 1, 2007, and encouraged plaintiff to abstain from alcohol. (Tr. 202-04.)

Plaintiff again saw his primary care physician, Dr. Punzalen, on February 22, 2007 for a one-month checkup. Plaintiff reported he was doing better. Dr. Punzalan noted plaintiff appeared comfortable and that he was scheduled to go back to work. (Tr. 186.)

Plaintiff returned to Dr. Hicks for periodic follow-up appointments from February 12, 2007 through September 21, 2007. (Tr. 237-49.) On February 12, 2007, plaintiff reported being "amazed at how much better" he felt and was looking forward to returning to work. (Tr. 205.) On February 26, 2007, plaintiff again reported that he was doing well and that the medicine was "doing the trick for [him]." Dr. Hicks assessed

---

[4]A GAF score, short for Global Assessment of Functioning, helps summarize a patient's overall ability to function. A GAF score has two components. The first component covers symptom severity and the second component covers functioning. A patient's GAF score represents the worst of the two components.

On the GAF scale, a score from 41-50 is indicative of serious symptoms or any serious impairment in social, occupational, or social functioning. Diagnostic and Statistical Manual of Mental Disorders 32-34 (4th ed., American Psychiatric Association 2000) ("DSM-IV-TR").

[5]Depakote is used to treat seizure disorders and certain psychiatric conditions, and to prevent migraine headaches. Abilify is used to treat certain mental/mood disorders, such as bipolar disorder, schizophrenia, and depression. WebMD, http://www.webmd.com/drugs (last visited November 16, 2011).

him with a GAF score of 55/65 and told him to discontinue Buspar.[6] (Tr. 201.)

On March 22, 2007, plaintiff saw Dr. Hicks for a follow-up appointment. Plaintiff reported feeling improved and that he had returned to work, where he was functioning better, but that he was pursuing a change in jobs. Plaintiff also reported that he had been going on walks and riding his four-wheeler. Plaintiff stated he had recently had one episode of heavy alcohol use but realized "it wasn't the best thing in the world to do." Dr. Hicks encouraged plaintiff to abstain from alcohol. (Tr. 200.)

On April 24, 2007, plaintiff saw Dr. Hicks for a follow-up appointment. He reported to Dr. Hicks that he was not doing well, was not sleeping, and was hyperactive. Dr. Hicks increased his Depakote prescription and reduced his Abilify. (Tr. 199.)

On May 7, 2007, plaintiff met with Dr. Hicks and reported that he was having "really really heavy anxiety" while at work and that he was "no longer able to cope" with the stress from work. Plaintiff stated that he had moved into a new position but the anxiety continued. As a result, plaintiff stated he was "beginning to think [he] might not be able to work anymore." He explained that the strain of working "drives [him] up a wall" and that "what bothers [him] the most is the filth," referring to his work at a recycling center. Plaintiff denied side effects from the medication except for mild transient dizziness. Although he was struggling at work, plaintiff reported that at home he was concentrating well and accomplishing tasks. Dr. Hicks recommended that plaintiff refrain from working for the next eight weeks. (Tr. 199.)

On May 23, 2007, plaintiff followed up with Dr. Hicks. Plaintiff reported he was feeling less pressure from not working the prior two weeks, and that he did not feel able to function at work. He stated that he was sleeping and concentrating well, had a good appetite, and was more socially active. He also stated that he was working with a law firm to assist him regarding disability. (Tr. 198.)

_____

[6]A GAF score from 51-60 is indicative of moderate symptoms or moderate difficulty in social, occupational, or school functioning. DSM-IV-TR, at 34.

On June 2, 2007, a relative of plaintiff, Kelly E. Pryor, completed a Function Report Adult - Third Party. In it, she stated that plaintiff lives with his mother and helps her around the house, rides his four-wheeler occasionally, and spends time on the internet. She also stated that his medications were helping and that he felt like doing more activities and socializing. She explained that although plaintiff spends most of his time at his mother's house, he goes to church and plays an instrument when he is able. She explained that he has never been lazy, has always been able to hold down a job, and was able to handle the stress of a job until the previous year when "something happened" and "he has never recovered." She also noted that before plaintiff went on "heavy medications," he would "self-medicate" with alcohol. At the time, she believed that he had not been drinking for several months. (Tr. 140-48.)

On June 21, 2007, plaintiff followed-up with Dr. Hicks. Plaintiff reported that he had been doing well "for the most part," was interacting well with his mother, and had noticed some weight gain with his prescription for Abilify. Plaintiff noted he was considering disability and was concerned that his insurance coverage would end soon. Dr. Hicks instructed plaintiff to continue taking Depakote and reduced his prescription for Abilify. (Tr. 197.)

On July 12, 2007, plaintiff had a follow-up appointment with Dr. Hicks. Plaintiff reported that he was doing relatively well and had good interaction with his family. In addition, plaintiff stated that he had notified his employer that he would not be returning. Plaintiff explained that he believed his current level of well-being relied upon his not working and that returning to work would result in him becoming stressed and having panic attacks. Plaintiff denied any difficulty with his medication and reported he had not been drinking. (Tr. 240.)

On July 26, 2007, Dr. Hicks opined that because of plaintiff's bipolar disorder, plaintiff was unable to return to work. (Tr. 228.)

On July 27, 2007, plaintiff reported to Dr. Hicks he was doing well, although he had occasional irritability, and that he enjoyed riding his four-wheeler. Additionally, plaintiff stated that he was hopeful that he would obtain disability benefits. (Tr. 239.)

On August 17, 2007, state agency psychologist Stanley Hutson, Ph.D., completed a Psychiatric Review Technique form. Dr. Hutson noted that plaintiff was diagnosed with bipolar II disorder depressed and alcohol dependence in full remission. Dr. Hutson opined that plaintiff had a mild restriction in activities of daily living, moderate difficulties in maintaining concentration, persistence, or pace, and marked difficulties in maintaining social functioning. Dr. Hutson indicated that plaintiff had no repeated episodes of decompensation of extended duration. Dr. Hutson opined that plaintiff's allegations were mostly credible and that although his condition was currently severe, it was not expected to stay severe for twelve months. (Tr. 208-18.)

That day, Dr. Hutson also completed a Mental Residual Functional Capacity Assessment. Dr. Hutson opined that plaintiff had moderate limitations on his ability to maintain attention and concentration for extended periods of time; perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; work close to or in coordination with others without becoming distracted by them; interact appropriately with the general public; get along with coworkers or peers without distracting them or otherwise exhibiting behavioral extremes; respond appropriately to changes in the work setting; and travel in unfamiliar places or use public transportation. Dr. Hutson also opined that although plaintiff did not want to return to his old job, he "appears to be capable of adapting to a new workplace." (Tr. 220-22.)

On August 24, 2007, plaintiff saw Dr. Hicks for a follow-up visit. Plaintiff told Dr. Hicks that he had been rejected for disability, but was able to respond to the news without incident. He also reported he was in good spirits, had good interaction with his mother, and continued to enjoy riding his four-wheeler. (Tr. 238.)

On August 27, 2007, Dr. Hicks wrote a letter stating that plaintiff had been unable to work since May of 2007 because, when attempting to work, he had prominent anxiety, irritability, and poor concentration because he felt distracted. Dr. Hicks also noted that plaintiff felt overwhelmed by his work responsibilities and would "likely be more stable in a different setting." (Tr. 227.)

On September 6, 2007, plaintiff was seen at the Salem Memorial District Hospital emergency room for suicidal ideation. Plaintiff reported he did not have a plan, but that he had wanted to hurt himself for the previous four days. He also reported that he was anxious, depressed, sad, frustrated, and had not been sleeping at night. (Tr. 260, 262.) Plaintiff was transferred and admitted to St. Mary's Health Center for a psychiatric evaluation. (Tr. 269, 277.)

On September 7, 2007, Suzanne King, M.D., saw plaintiff. Dr. King noted that plaintiff complained of poor sleep, anxiety, panic attacks, missing his family, and a history of alcohol problems. Plaintiff reported his alcohol use is usually in remission, but that he had drunk some the prior day and that he knew it was a mistake. Dr. King opined that plaintiff was bipolar depressed, had anxiety disorder, not otherwise specified, and that he had some history of alcohol dependence. Dr. King assessed plaintiff with a GAF score of 30,[7] estimated he would need to stay in the hospital for three to five days, increased his Abilify, and prescribed Melatonin for sleep.[8] (Tr. 284-85.) Plaintiff was discharged on September 11, 2007 with a diagnosis of bipolar depressed, anxiety, and alcohol dependence. He was ordered to refrain from abusing alcohol and to follow-up with Dr. Hicks. (Tr. 277.)

On September 21, 2007, plaintiff saw Dr. Hicks and reported that his hospitalization "really benefitted [him] a lot," that he felt less downcast, and that the melatonin was improving his sleep. Dr. Hicks assessed plaintiff with a GAF score of 55. (Tr. 237.)

On September 24, 2007, Dr. Hicks completed a 12.04 questionnaire regarding plaintiff's affective disorders. In Part A, Dr. Hicks stated plaintiff was suffering from a present disturbance of mood, pervasive loss of interest in almost all activities, sleep disturbance, decreased

---

[7]A GAF score from 21-30 is indicative of behavior influenced considerably by delusions or hallucinations, or is a serious impairment in communication or judgment (such as suicidal preoccupation), or is an inability to function in almost all areas with symptoms including staying in bed all day, no job, no home, and no friends. DSM-IV-TR, at 34.

[8]Melatonin is used to treat insomnia, anxiety, and cluster headaches. WebMD, http://www.webmd.com/drugs (last visited November 16, 2011).

energy, difficulty concentrating, and easy distractibility. In Part B, Dr. Hicks opined that he had apparently extreme restrictions on his activities of daily living, moderate difficulties in both maintaining social functioning and in concentration, persistence, or pace, and one to two episodes of decompensation, each of extended duration. In Part C, Dr. Hicks opined that plaintiff had a current history of one or more years' inability to function outside a supportive living situation and would have a continued need for such an arrangement. (Tr. 229-31.)

Regarding his mental residual functional capacity, Dr. Hicks opined that plaintiff was markedly limited in his ability to respond appropriately in the work setting; and in his ability to complete a normal workday or week without interruption from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number of rest periods. Dr. Hicks also opined that plaintiff was moderately limited in his ability to carry out detailed instructions; to maintain attention and concentration for extended period of time; to perform activities within a schedule, to maintain regular attendance, to be punctual within customary tolerances; and to maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness. (Tr. 232-33.)

On October 24, 2007, Dr. Hicks opined that plaintiff had obsessive compulsive disorder and major depression predating his alcohol use. Dr. Hicks opined that plaintiff's mental illness would continue to severely impair him, even if he abstained from alcohol abuse. (Tr. 236.)

Plaintiff continued to visit Dr. Hicks every one to two months from October 2008 through April 2009 for treatment of his bipolar II disorder, likely obsessive-compulsive disorder with poor insight, and alcohol dependence, sustained full remission. From October 2008 through early 2009, plaintiff reported to Dr. Hicks that he felt more stable, less anxious, was sleeping well, had a good appetite, good concentration, good interaction with his family, was walking for exercise, helping around the house, and riding his four-wheeler. He also denied crying spells or irritability. (Tr. 287-94.) Although he was "kind of depressed," distressed, and anxious after his mother was injured in May 2008, he was still active around the house, taking care of his mother, and sleeping

well. (Tr. 292-93.) Dr. Hicks assessed plaintiff's GAF Score as 55/65 on October 15, 2007, with it rising to 65/65 on May 30, 2008.[9] (Tr. 291, 294.) Plaintiff denied recent alcohol abuse on October 15, 2007, February 8, 2008, May 30, 2008, August 22, 2008, and October 3, 2008. (Tr. 288, 291-94.)

On February 5, 2009, Dr. Hicks completed several questionnaires regarding plaintiff's condition. In Part A of a 12.04 affective disorders questionnaire, Dr. Hicks opined that plaintiff suffered from a disturbance of mood accompanied by full or partial manic or depressive symptoms. Plaintiff's present depressive symptoms included pervasive loss of interest in almost all activities, appetite disturbance with change in weight, and feelings of worthlessness. Present manic symptoms included hyperactivity, easy distractibility, and involvement in activities having a high probability of an unrecognized painful consequence. Dr. Hicks also opined plaintiff was presently experiencing bipolar syndrome with a history of episodic periods manifested by both manic and depressive syndromes. In Part B, Dr. Hicks opined that plaintiff had several functional limitations, including mild restrictions on activities of daily living, moderate difficulties in maintaining social functioning, moderate deficiencies of concentration, persistence, or pace, and four or more repeated episodes of decompensation. In Part C, Dr. Hicks stated plaintiff had a medically documented history of at least two years duration that included repeated episodes of decompensation, each of an extended duration, a present residual disease process resulting in marginal adjustment that even minimal increases in mental demands or changes in the environment would be predicted to cause plaintiff to decompensate, and a current history of one or more years' inability to function outside a highly supportive living arrangement with a continued need for such an arrangement. (Tr. 297-99.)

Dr. Hicks also completed a 12.06 Anxiety Related Disorders questionnaire. In Part A, Dr. Hicks noted that plaintiff had anxiety as

---

[9]A GAF score from 61-70 is indicative of some mild symptoms or some difficulty in social or occupational functioning but with a general ability to function well and have some meaningful interpersonal relationships. DSM-IV-TR, at 34.

the predominant disturbance or anxiety experienced in the attempt to master symptoms.  He opined that plaintiff experienced persistent anxiety accompanied by motor tension, autonomic hyperactivity, apprehensive expectation, and vigilance and scanning, as well as recurrent obsessions or compulsions and intrusive recollections of a traumatic experience that are a source of marked distress.  (Tr. 300-01.)  On February 13, 2009, Dr. Hicks completed Part C of the questionnaire, opining that plaintiff's symptoms resulted in a complete inability to function independently outside the area of his home.  (Tr. 308.)

In a mental residual functional capacity questionnaire filled out on February 5, 2009, Dr. Hicks opined that plaintiff was markedly limited in his ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; to complete a normal workday or week without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and to maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness.  Dr. Hicks also opined that plaintiff was moderately limited in his ability to carry out detailed instructions; to maintain attention and concentration for extended periods of time; to work in coordination with or proximity to others without becoming distracted; to make simple work-related decisions; to accept instructions and respond appropriately to criticism from supervisors; to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; to respond appropriately to changes in the work setting; and to travel in unfamiliar places or use public transportation.  (Tr. 302-04.)

That day, Dr. Hicks also filled out a Drug Abuse and Alcoholism Questionnaire, stating that plaintiff has a diagnosed mental illness predating any use of drugs or alcohol and that even if plaintiff abstained from alcohol abuse, the mental illness would continue to severely impair him.  (Tr. 305.)

On April 7, 2009, plaintiff informed Dr. Hicks he was manic and could not sleep because of his upcoming disability hearing.  Dr. Hicks increased his Abilify dosage.  On April 8, 2009, plaintiff met with Dr. Hicks and stated that he had a recent hand tremor from his medication,

that he was feeling anxious and downcast, and that he struggled with limited motivation but was planning to resume four-wheeling when the weather improved. Plaintiff also reported that the day before, he hardly got out of bed. (Tr. 311.)

On July 10, 2007, plaintiff completed a Function Report - Adult. Plaintiff reported that each day, he gets dressed, checks his email to keep in touch with friends and family, watches television, naps, and takes turns with his mother making dinner. He spends time with his mother each day, visits or speaks to his cousin on the phone weekly, and attends church weekly. He does some household chores such as paying bills, vacuuming, taking the trash out, doing yard work, and going grocery shopping with his mother, although he stated that he could not stand in the checkout line because of extreme anxiety. Plaintiff noted that he avoids social situations, is unable to relax, takes a sleep aid because his mind is racing, has difficulty reading due to his short-term memory and problems concentrating, and has to force himself to do things around his house. He does not drive long distances because he zones out and forgets where he is going. He lacks motivation and desire to participate in his prior activities such as riding his four-wheeler, hiking, and camping. He has several rituals, such as checking to make sure the doors are locked, which he feels compelled to do several times a day. (Tr. 149-56.)

In an unsigned and undated Disability Report - Adult Form, plaintiff reported suffering from bipolar disorder, obsessive compulsive disorder, panic anxiety disorder, and severe depression. He stated he has been unable to work since December 2006 due to his condition. He also stated that he lacks motivation, avoids social contact, cannot handle stress or a structured environment without experiencing panic attacks, has difficulty concentrating, thoughts of death, is compelled to do rituals throughout the day, has difficulty sleeping, and has fatigue. (Tr. 132.)

**Testimony at the Hearing**

On April 13, 2009, plaintiff appeared and testified before an ALJ. (Tr. 18-44.) Plaintiff testified to the following. He is six feet tall and weighs 225 pounds. His weight has fluctuated both up and down, which

his doctors attribute to Abilify, a medication he takes.  His hands also shake from Abilify, which makes it difficult for him to write or use a keyboard and prevents him from playing the accordion.  Plaintiff is divorced, has no minor children, and lives with his mother.  (Tr. 21, 27, 34.)

Plaintiff testified that he suffers from obsessive-compulsive disorder and bipolar II disorder.  His bipolar disorder causes him to have manic episodes followed by severe depression.  He had about twenty episodes the prior year.  The manic episodes last between four and five days and the resulting depressive mood lasts between ten and fourteen days, during which time he "pretty much" stays in bed and does not shower, shave, or brush his teeth.  (Tr. 29-31.)  He has panic attacks that are triggered by stressful situations, such as being criticized or being around a group of people.  During the attacks, he gets weak, shakes, his heart races, he has chest pains, and he breaks into a cold sweat.  (Tr. 33.)

Plaintiff testified he has a history of alcohol abuse but that he does not have a drinking problem and has not been to rehab.  The last time he drank alcohol was approximately three weeks prior to the hearing. He has had some relapses, but they usually occur when he is manic, when he tends "to make some dumb choices."  His psychiatrist, Dr. Hicks, was not familiar with his past or present drinking because Dr. Hicks "didn't ask me about it."  (Tr. 22, 43-44.)

Plaintiff testified that he had been seeing Dr. Hicks since January, 2007, but that he has not been seeing a counselor or psychologist because he cannot afford to do so.  He was hospitalized in September, 2007 for suicidal ideation and although he occasionally thinks of suicide, he has not made any plans or acted upon it.  (Tr. 31-33.)

Plaintiff testified there is a history of mental illness in his family, with both biological parents suffering from emotional problems, his mother committing suicide, and his father abusing alcohol. Additionally, his daughter is bipolar.  (Tr. 30-31.)

Plaintiff testified that he is a high school graduate but does not have any post-high school training.  He has a current commercial driver's license for 18-wheelers and he drove trucks for approximately seven

years.  (Tr. 22-23, 28.)  He also previously worked as an automotive technician repairing cars.  (Tr. 28.)  At the time he stopped working on December 12, 2006, he worked as a water purification treatment plant operator at Doe Run.  There, he was on his feet most of the day and had to lift fifty pounds regularly and up to one hundred pounds rarely.  He had trouble working because he was unable to concentrate, would become confused and disoriented, repeated tasks, and checked on completed tasks fifteen to twenty times.  As a result, he stopped working upon the recommendation of his primary care physician, Dr. Punzalan.  Although he tried to go back to work, he "relapsed" after two months and quit working again.  Since then, he has not tried to return to work.  (Tr. 23, 26-27.)

Although he was always a "pretty anxious" person, plaintiff testified that in the past, he could force himself to work through his symptoms.  However, they have "gotten much worse" in the previous four or five years and he can no longer work through them, causing him to become in trouble with his employer.  (Tr. 35.)  He cannot work because his depression would cause him to miss work and he cannot get things done at work because he does things repeatedly.  (Tr. 42-43.)

Plaintiff also testified that he lives with his mother and that she recently broke her hip.  While she was injured, plaintiff did most of the cooking and laundry and took care of the yard, although his mother would often have to "badger" him to get him to do it.  He does some household chores but lacks motivation to get things done and can go several days without bathing.  He keeps in contact with his daughters through email and talks to his mother each day.   (Tr. 37-42.)

Plaintiff testified that he does not like being around crowds.  When he goes grocery shopping, he goes during off hours and when he attends church, he sits in the back.  He has difficulty reading because he is easily distracted and cannot concentrate for more than ten minutes at a time.  (Tr. 32, 34.)  He also has trouble sleeping at night and naps through the day.  His doctor informed him that sleepiness is associated with his medication, Depakote.  (Tr. 36.)

Regarding his hobbies, plaintiff testified he was forced to quit playing the accordion at church because he lost the fine motor control

in his hands.  Additionally, although he rides his four-wheeler, he does so alone.  (Tr. 40-41.)

### III.  DECISION OF THE ALJ

On May 7, 2009, the ALJ issued a decision denying plaintiff's claims.  (Tr. 8-17.)  At Step One of the required sequential analysis, the ALJ determined that plaintiff has not engaged in substantial gainful activity since December 12, 2006, the alleged onset date.  (Tr. 10.)  At Step Two, the ALJ found that plaintiff has the severe impairments of bipolar affective disorder, "likely" obsessive-compulsive disorder, anxiety, panic disorder, and severe depression.  (Tr. 10.)  At Step Three, the ALJ found that plaintiff does not suffer from an impairment or combination of impairments of a severity that meets or medically equals a listed impairment found in 20 C.F.R. Part 404, Subpart P, App'x 1.  (Tr. 10-12.)

The ALJ then determined that plaintiff has the residual functional capacity (RFC) to perform a full range or work at all exertional levels, except that mental impairments preclude him from more than frequent interactions with supervisors, coworkers, and the general public.  (Tr. 12.)

At Step Four, the ALJ found that plaintiff is able to perform his past relevant work as an auto technician, laborer, or truck driver, as these jobs are not precluded by his RFC.  (Tr. 16.)  Accordingly, the ALJ concluded plaintiff was not disabled.  (Tr. 16-17.)

Because plaintiff was not disabled and his alcohol abuse was in remission, the ALJ stated it was not necessary to consider the question of whether his alcohol abuse is material.  (Tr. 17.)

### IV.  GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and is supported by substantial evidence in the record as a whole.  Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009).  "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the

Commissioner's conclusion." _Id._ In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. _Id._ As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove he is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A); Pate-Fires, 564 F.3d at 942. A five-step regulatory framework is used to determine whether an individual qualifies for disability. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing the five-step process); Pate-Fires, 564 F.3d at 942.

Steps One through Three require the claimant to prove (1) he is not currently engaged in substantial gainful activity, (2) he suffers from a severe impairment, and (3) his impairment meets or equals a listed impairment. Pate-Fires, 564 F.3d at 942. If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five. _Id._ Step Four requires the Commissioner to consider whether the claimant has the RFC to perform past relevant work. _Id._ The claimant bears the burden of demonstrating he is no longer able to return to his past relevant work. _Id._ If the Commissioner determines the claimant cannot return to past relevant work, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work. _Id._

In this case, the Commissioner determined that, although plaintiff suffers from severe impairments, he has the RFC to perform his past relevant work.

## V.  DISCUSSION

Plaintiff argues the ALJ's decision is not supported by substantial evidence.  Specifically, plaintiff argues the ALJ failed to evaluate and assign weight to the opinion of state agency psychologist Stanley Hutson; the ALJ failed give proper deference to the opinions of his treating physician, Dr. Hicks; and the ALJ failed to conduct a proper psychiatric review technique analysis.

### A.  Opinion of Dr. Hutson

Plaintiff challenges the ALJ's RFC determination, contending the ALJ erred by failing to discuss and give weight to the opinion of a state medical consultant, Dr. Stanley Hutson.

In making a disability determination, "[t]he ALJ [has] a duty to evaluate the medical evidence as a whole." Flynn v. Astrue, 513 F.3d 788, 792 (8th Cir. 2008) (quoting Casey v. Astrue, 503 F.3d 687, 691 (8th Cir. 2007)).  When evaluating the medical evidence, the ALJ "must explain in the decision the weight given to the opinions of a state agency medical or psychological consultant" unless the opinion of the treating source is given controlling weight.  20 C.F.R. § 404.1527(f)(2)(ii).

Here, the ALJ did not give the opinion of plaintiff's treating physician, Dr. Hicks, controlling weight, having found the limitations Dr. Hicks expressed were "not persuasive."  (Tr. 15.)  Because the treating source opinion was not given controlling weight, the ALJ was required to explain the weight given to the opinion of the state agency medical consultant, Dr. Hutson.  20 C.F.R. § 404.1527(f)(2)(ii).  Here, the ALJ failed to mention the opinion of Dr. Hutson, who completed a Psychiatric Review Technique form on August 17, 2007, opining that plaintiff had a mild restriction in activities of daily living; moderate difficulties in maintaining concentration, persistence, or pace; marked difficulties in maintaining social functioning; and no repeated episodes of decompensation of extended duration.  (Tr. 216.)

Additionally, "[t]he RFC assessment must always consider and address medical source opinions.  If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted."  SSR 96-8p, 1996 WL 374184, at *7 (July 2, 1996).

Here, the ALJ found that plaintiff had the RFC to perform a full range of work and that his mental impairments only precluded more than frequent interactions with coworkers, supervisors, or the general public. (Tr. 12.)  Dr. Hutson, however, opined that plaintiff also had moderate difficulties in maintaining concentration, persistence, or pace and mild restrictions in activities of daily living.  The ALJ's RFC determination does not reflect these restrictions, and therefore, is inconsistent with Dr. Hutson's opinion.  As such, the ALJ was required to explain why he rejected or otherwise afforded little weight to Dr. Hutson's opinion.

Therefore, the ALJ erred in failing to explain his treatment of Dr. Hutson's opinion.  On remand, the ALJ shall consider and discuss his treatment of the opinion of state medical consultant Dr. Hutson.

**B.  Opinions of Dr. Hicks**

Plaintiff argues that the ALJ failed to give controlling weight to the medical opinion of treating physician Dr. Frederick Hicks and that in doing so, failed to properly develop the plaintiff's RFC.

A treating physician's medical opinion is entitled to controlling weight only if it is "'well-supported' by 'medically acceptable' clinical and laboratory diagnostic techniques" and is "'not inconsistent' with the other 'substantial evidence' in the individual's case record."  SSR 96-2p, 1996 WL 374188, at *2 (July 2, 1996); see also Tilley v. Astrue, 580 F.3d 675, 679 (8th Cir. 2009).  "The record must be evaluated as a whole to determine whether the treating physician's opinion should control." Tilley, 580 F.3d at 679.  If the treating physician's opinions "are inconsistent or contrary to the medical evidence as a whole, they are entitled to less weight."  Krogmeier v. Barnhart, 294 F.3d 1019, 1023 (8th Cir. 2002); see also Hogan v. Apfel, 239 F.3d 958, 961 (8th Cir. 2001)("The ALJ may discount or disregard such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions.")

First, plaintiff argues the ALJ improperly concluded that Dr. Hicks's opinions were undermined by plaintiff's alcohol abuse because, although plaintiff testified he did not inform Dr. Hicks of his alcohol

intake, the record shows Dr. Hicks was aware of plaintiff's relapses with alcohol.

The ALJ acknowledged, however, that Dr. Hicks was aware of at least some of plaintiff's alcohol use, despite plaintiff's testimony indicating the contrary. For example, the ALJ noted that plaintiff's medical records of March 22, 2007 showed plaintiff told Dr. Hicks he had become drunk recently. The ALJ has a duty to resolve conflicts in the record. Jones v. Barnhart, 335 F.3d 697, 703 (8th Cir. 2003). Because substantial evidence supports the ALJ's decision to resolve the conflict by giving Dr. Hicks's opinion less weight, this court should not reverse, even if it would have resolved the conflict differently. See Perkins v. Astrue, 648 F.3d 892, 897 (8th Cir. 2011) ("If, after reviewing the record, the court finds it possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision." (citation omitted).

Plaintiff also argues the ALJ improperly failed to consider Dr. Hicks's two medical source statements when forming the RFC. First, plaintiff argues that the RFC should have reflected Dr. Hicks's opinion that he has moderate limitations with regard to his concentration, persistence, or pace. Second and more specifically, Dr. Hicks stated that plaintiff is markedly limited in his ability to perform activities within a schedule or complete a normal workday or week without interruption from psychologically based symptoms and to perform at a consistent pace and without an unreasonable number and length of rest periods. Dr. Hicks expressed these opinions on September 24, 2007 and February 5, 2009. (Tr. 230, 233, 298, 303.)

The ALJ concluded, first, that the limitations expressed by Dr. Hicks as to plaintiff's limitation in concentration, persistence, or pace were inconsistent with his treatment notes and not well-documented. (Tr. 15.) The ALJ stated that "[n]o observation is made by this physician or the [plaintiff's] primary care physician that supports that the [plaintiff] has even moderate limitations to his concentration, persistence, and pace" and that instead, "the records note on May 7, 2007 that the [plaintiff] had good concentration." (Tr. 15.)

The ALJ's conclusion, first, regarding plaintiff's concentration,

persistence, or pace is supported by substantial evidence. The record indicates that plaintiff often denied having a problem with concentration. In addition to the May 7, 2007 record cited by the ALJ, plaintiff also reported to Dr. Hicks that he was concentrating well on February 26, 2007, March 22, 2007, May 7, 2007, May 23, 2007 and on December 21, 2007. (Tr. 198-201, 289.) This evidence is inconsistent with Dr. Hicks's conclusion that plaintiff has moderate limitations with regard to concentration, persistence, or pace. See <u>Hacker v. Barnhart</u>, 459 F.3d 934, 937 (8th Cir. 2006) ("A treating physician's own inconsistency may also undermine his opinion and diminish or eliminate the weight given his opinions.")

The ALJ found, second, that Dr. Hicks's opinion concerning plaintiff's ability to perform activities within a schedule or complete a normal workday or week without interruption from psychologically based symptoms is totally unsupported by the record. (Tr. 15.) The undersigned disagrees for two reasons.

First, the regulations seem to combine the two factors on which Dr. Hicks rendered opinions, i.e. (1) plaintiff's concentration, persistence, or pace, and (2) whether plaintiff could perform activities within a schedule or complete a normal workday or week without interruption from psychologically based symptoms. The regulations define "concentration, persistence, or pace" as referring

> to the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings.
> * * *
> We must exercise great care in reaching conclusions about your ability or inability to complete tasks under the stresses of employment during normal workday or workweek . . . .

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(B)(3). And yet the forms Dr. Hicks filled out separated these factors for separate consideration. (Tr. 298, 302-03.) While the findings of the ALJ regarding plaintiff's concentration, persistence, or pace find support in the record, his rejection of Dr. Hicks's opinions regarding factor (2) relies only on the same record, without discussing plaintiff's ability to complete employment tasks during normal workdays or workweeks. Because the issues

may be different, the ALJ's explanation for rejecting Dr. Hicks's opinion is insufficient. See Reed v. Barnhart, 399 F.3d 917, 921-22 (8th Cir. 2005) (holding that the ALJ failed to articulate a sufficient reason for discounting a treating physician's opinion given the nature of the treating relationship and treating physician's supporting medical records). If Dr. Hicks's opinions on (2) are unclear about why they differ from his opinions regarding (1), the ALJ should obtain an explanation for this from Dr. Hicks, especially since Dr. Hicks treated plaintiff over a substantial period of time.

## C. Psychiatric Review Technique

Plaintiff argues the ALJ erred in failing to complete a proper psychiatric review technique at Steps Two and Three of the required sequential analysis.

Psychiatric review technique analysis is required to be conducted and documented at each level of the review process. 20 C.F.R. § 416.920a. The technique requires a determination of whether there is a mental impairment, as well as a rating of the degree to which a functional limitation results from the impairment. Nicola v. Astrue, 480 F.3d 885, 887 (8th Cir. 2007). The ALJ may include the analysis in the written decision rather than use the written form. Id.

Here, the ALJ failed to make express findings regarding the degree of plaintiff's functional limitations. The Commissioner concedes that the ALJ's rating of plaintiff's impairments were "less than perfectly articulated." (Doc. 17 at 4.) On remand, the ALJ should complete the psychiatric review technique in accordance with 20 C.F.R. § 404.1520a.

## VI. RECOMMENDATION

For the reasons set forth above, it is the recommendation of the undersigned that the decision of the Commissioner of Social Security be remanded for reconsideration and further proceedings consistent with this opinion.

The parties are advised that they have 14 days to file written objections to this Report and Recommendation.  The failure to file timely written objections may waive the right to appeal issues of fact.


                                    ___/S/___David D. Noce_____
                                    **UNITED STATES MAGISTRATE JUDGE**



Signed on November 29, 2011.